788

TUTEUR & CO., Inc., Libellant,

v.

THE Steamship ITTERSUM and Isbrandt-sen Company, Inc., Respondents.

No. 2884.

United States District Court
E. D. Louisiana,
New Orleans Division.

June 2, 1958.

———◆———

Deutsch, Kerrigan & Stiles, Robert Deane, New Orleans, La., for libellant.

James J. Morrison, New Orleans, La., for respondent.

J. SKELLY WRIGHT, District Judge.

This libel in admiralty seeks recovery for damage to a cargo of steel. The cargo, consisting of 397 "I" and "H" beams, 107 bundles of channels and 15 bundles of angles, was shipped in good order from Antwerp aboard the Steamship Ittersum in December, 1954, and was discharged at Houston, Texas, December 28, 1954 through January 3, 1955. At libellant's request, the steel was discharged by ship's tackle directly into gondola type rail cars. These cars were moved to and unloaded at Byers Barge Terminal, some seven miles away, where the general manager of the terminal reported that 17 beams and 45 channels were dented, bent or bowed on arrival. The damaged beams and channels were separated from the other steel, and they were later sold locally for $970.20.

Libellant alleges that the steel was damaged during discharge at dockside while it was in the care and custody of the respondent and before libellant took delivery of the gondola cars. Respondent claims that the evidence shows that the damage occurred, not while the cargo was in its custody, but while the steel was in transit by railroad to the terminal or while being unloaded there; that libellant, therefore, has failed to sustain its burden of proving that the steel was delivered from respondent's custody in a damaged condition. This factual issue is the only question in the case. Respondent, in answering, has claimed certain exceptions provided in the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304 (2) (a), § 1304(1) and § 1304(2) (q), but has introduced no evidence to support its claims.

Libellant's consignment of beams, channels and angles was stowed in the

Ittersum's lower holds Nos. 2, 3, 4 and 5. Thirteen of the beams later reported as damaged were stowed in No. 3 lower hold; the other four beams and 45 channels reported damaged were stowed in No. 2 lower hold. The main deck hatches of all the holds were approximately 33 feet long and 24 feet wide. The 'tween deck hatches were the same size, except for No. 3 hold where the 'tween deck hatch was only 22 feet long. The damaged beams and channels varied in length from 20 feet to 48 feet. All but four were 40 feet or over. Under these circumstances the beams could only be extricated from the holds by raising one end before the other and lifting the beams out at an angle, in some cases raising them vertically. Except for the very longest which were handled singly, the beams were discharged in lifts of 2, 3, 5 and sometimes 8 pieces. The channels were discharged 2 or 3 bundles at a time.

Observing the discharging operations was a tally clerk in each hold, and a chief wharf clerk and his assistant on deck. These clerks were employed by the respondent. Libellant had engaged an experienced cargo surveyor, W. L. Farnsworth, who observed the operation from the dock. The person chiefly responsible for noting damage to the cargo during discharge and later entering it on the tally sheets, was the chief wharf clerk, or his assistant. These two had to watch three to five holds discharging simultaneously, and for much of the time, particularly at night, they alternated and only one was in attendance. Under these circumstances, it was impossible for them to watch all parts of the operation at once and fully report all damage that occurred. Their tally sheets show damage to 3 beams and 10 channels. One sheet bears the notation: "2 pcs bent on edge—fell back in hole."

The stevedoring operation was conducted in the usual manner, that is to say, as fast as possible, with considerations of time outweighing the possibility of minor cargo damage. The vessel was discharged around the clock, and the teams of stevedores worked straight through the New Year holiday. Libellant's surveyor, Farnsworth, testified that he was on the dock while the steel was being discharged into the rail cars assigned to libellant; that he observed beams striking the hatch coamings, the bulwarks, and the sides of the gondola cars. He was unable to tally the damage piece by piece at that time since it was unsafe to stand in the cars while the steel was being discharged.

The gondola cars were moved to Byers Barge Terminal, where L. Jacobsen, the general manager, personally supervised the unloading operation. The beams were unloaded one by one onto racks, and any damaged beams or channels were put to one side as they came out of the car. The cars were unloaded during a period of a week or ten days. Jacobsen made up the "Report of Freight Received" himself and noted thereon the beams and channels damaged on arrival: the 17 beams and 45 channels which are the subject of the present libel. Jacobsen's list includes the 3 beams and 10 channels reported on the chief wharf clerk's tally sheets.

A few days later, about the end of January, Surveyor Farnsworth came to the terminal, and Jacobsen showed him the damaged steel. Farnsworth surveyed the damage and drew up a report in which he asserted that the injuries to the steel were of a type which could only have occurred during the discharge operation at the dock. He later testified that since none of the damage noted was "fair end damage," it could not have been caused by the steel shifting in the rail cars while they were in transit to the terminal.

Respondent, searching for an inconsistency in Jacobsen's testimony, points to his statement that during the unloading operation at the terminal the bundles of channels had been lifted by hooking onto one of the strands of wire which held the bundles together, and in several instances the wire broke allowing the bundle to fall back in the rail car. Respondent suggests that this was enough

to cause damage. It appears, however, that the bundles were lifted by the wire only about six inches, enough to allow a sling to slip under the end. The likelihood of damage involved in a drop of six inches is insufficient to discredit Jacobsen's report that the steel was already damaged when it arrived at the terminal.

Respondent also suggests that the gondola cars may have been involved in a train wreck during the seven-mile journey to the terminal. Inasmuch as there is no evidence of any delay in the shipment or any damage to the rail cars themselves, this rather far-fetched hypothesis must be disregarded. The finding of the Court is that the damage occurred before delivery to libellant while the cargo was in the care and custody of the respondent.

As part of its defense, respondent asserts that when libellant's agent accepted delivery of the cargo in the gondola cars, he signed receipts on which no damage was noted. The documents in question are undated "Freight Reports" prepared by respondent, on which is listed the various bills of lading and the numbers of the rail cars into which they were discharged. At the bottom of each sheet there is printed: "Show All Exception In Body Of This Report," but there is no space for marking such exceptions, and no exceptions are reported, not even those noted by respondent's wharf clerk. It is not clear whether these words are addressed to the agents of the owner of the cargo or to the carrier's agents who prepare the report. In this case, the freight forwarder who signed these reports for libellant had no authority to inspect the goods or to note exceptions for damage. Under the circumstances, the Court is satisfied that these documents were not intended by either party to constitute evidence of receipt of the cargo in good order but were merely reports indicating the rail cars in which the cargo had been loaded.

Lastly, respondent, citing Miami Structural Iron Corp. v. Cie Nationale, etc., 5 Cir., 224 F.2d 566, claims that no notice of damage was given it by libellant. Under 46 U.S.C.A. § 1303(6), the removal of the cargo by libellant without giving notice of damage would constitute prima facie evidence of delivery of the cargo in good order, and would shift to libellant the burden of proving that the cargo was, in fact, delivered in a damaged condition. Here the libellant has sustained that burden, and this defense cannot aid the respondent.

In connection with the question of damage, respondent charges the libellant spirited away the damaged goods and sold them secretly before respondent had any opportunity to inspect them. The facts are otherwise. On January 3 and January 10, 1955, libellant sent letters to respondent advising that the cargo had arrived at destination in a damaged condition and that claim would be filed as soon as the extent of the damage was established. Respondent's own tally sheets indicated that some damage had occurred during discharge. The damaged cargo was not removed from the terminal yard until February 15, 1955. Respondent had ample opportunity to protect itself by making its own survey.

The conclusion of this Court is that libellant is entitled to judgment against the respondent for the market value [1] of the damaged steel less the $970.20 already recovered in the salvage sale.

Let appropriate decree be drawn and presented.

1. Sanib Corporation v. United Fruit Co., D.C., 74 F.Supp. 64; Pan-Am Trade & Credit Corporation v. The Campfire, D. C., 64 F.Supp. 179, 1946 A.M.C. 644, affirmed 2 Cir., 156 F.2d 603.