**S. M. SARTORI, INC., Plaintiff,**

v.

**S. S. KASTAV, her engines, etc. and Jugoslavenska Linijska Providba, Defendants.**

**No. 73 Civ. 2326.**

United States District Court,
S. D. New York.

May 11, 1976.

---

6. Va.Code Ann. §§ 40.1–58 to –69 (1970).

Bigham, Englar, Jones & Houston, New York City, for plaintiff; Daniel A. Sullivan, Alexander Peltz, New York City, of counsel.

Cichanowicz & Callan, New York City, for defendant; Donald B. Allen, Michael J. Carcich, New York City, of counsel.

LASKER, District Judge.

S. M. Sartori, Inc. seeks to recover after trial for damage to its cargo of cheese which was transported by the defendant steamship company from Leghorn, Italy, to New York, New York.

Three hundred cartons of Parmigiano Reggiano cheese and fifteen boxes of advertising forms were delivered to the S.S. "Kastav" on February 28, 1972. Although no refrigeration was requested, 155 cartons were stowed in a refrigerated compartment on No. 4 Upper Tween Deck. The other 145 cartons were also placed in a refrigerator compartment on the same deck, but the refrigeration system was not in operation there during the voyage. When the vessel arrived in New York on March 11, 1972, the cartons that had been refrigerated were in good condition but the unrefrigerated cartons were badly damaged with stains and some were leaking. It is undisputed that the damage resulted from butter fat that had oozed from the cheese. (Ex. 19)

## I.

### Liability

Under Section 3(2) of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C.

§ 1303(2), a carrier is obligated to properly stow and care for the goods it ships. The cargo owner contends that the carrier is liable in the present case because the damage to the cheese resulted from excessive heat in the storage area and was caused by a failure to properly ventilate the compartment which was not refrigerated. According to the plaintiff, if the compartment had been ventilated every two hours as the crew had been instructed, the temperature would have been cool enough to stow the cheese without damage. The carrier argues that it is not liable because the plaintiff failed to establish that the cheese was in good condition at the time it was delivered to the ship or that the damage did not result from an "inherent vice" in the cargo.

■ Under COGSA, a cargo owner establishes a *prima facie* case by showing receipt of the cargo by the ship owner in good condition and delivery in a damaged state. E. g., *Demsey & Associates v. SS Sea Star*, 461 F.2d 1009, 1014 (2d Cir. 1972). A "clean" bill of lading with no exceptions, such as that issued here (Ex. 5), is evidence of the apparent good condition of the cargo. *Hecht, Levis & Kahn, Inc. v. The S.S. President Buchanan*, 236 F.2d 627, 631 (2d Cir. 1956). However, as the carrier properly points out:

"... when deterioration of the goods may have resulted from a hidden defect, the shipper ... must present some evidence beyond the bill of lading since the bill of lading is evidence only of apparent or external good condition." *Id.*

Nevertheless, it does not follow, as defendant contends, that the plaintiff failed to establish a *prima facie* case because it did not introduce evidence as to actual inspection of the internal composition of the cheese prior to shipment. Testimony as to the nature of the goods and the type of damage suffered is acceptable as evidence of the condition of the cargo at the time of delivery to the ship. *Kupfermann v. United States*, 227 F.2d 348, 349–50 (2d Cir. 1955); *Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha*, 102 F.2d 450, 451–

52 (2d Cir. 1939); *The Africa Maru*, 54 F.2d 265 (2d Cir. 1931).

■ Turning first to the nature of the cargo, Charles Battaglia, a cheese importer for 25–30 years, testified that Parmigiano cheese is a very hard cheese that never as a normal matter "runs" (oozes butter fat) like the cheese here did. He also testified that when he ships such cheese in February and March, he never requests refrigeration and he has never seen Parmigiano cheese arrive in the condition such as that of the cargo here. Battaglia's testimony was corroborated by Rudolph Faehndrich, a veteran cheese importer and by that of Merle Allen, master mariner and surveyor, that refrigeration is unnecessary because Parmigiano cheese will keep well at temperatures as high as 68–70° F. Although one defense witness, a laboratory chemist who had tested cheeses, testified that all Parmigiano cheese is not chemically identical and that differences in moisture, fat, salt content and other variables would produce differences in keeping ability, he did not dispute the view of plaintiff's witnesses that the cheese should keep at 70° F.

The condition of the damaged cartons upon delivery in New York suggests that the problem did not stem from any inherent defect in the cheese. When the crates were loaded in Italy, there were no stains visible; if butter fat had already begun to ooze, it is reasonable to infer that stains would have been evident. Unlike damage such as mold which would not have been apparent from the outside of the shipping cartons, evidence of the type of damage suffered here would have been apparent. As was the case in *Kupfermann v. United States*, where the cargo owner recovered, the bills of lading here "are bereft of any indication of the damage *here* found when the cargo was outturned in New York." *Supra*, 227 F.2d at 350. (Emphasis in original)

Finally, the conditions under which the unrefrigerated cheese was transported make it more likely than not that the damage was not caused by inherent defects but by excessive heat. The temperature outside the vessel—the temperature at which

the cheese would have been stored if the unrefrigerated compartment had been properly ventilated—ranged from 27 to 70° F. and averaged in the 50° range. (Ex. 1) When the ship arrived in New York, the outside air temperature was between 20 and 37° F., but the "spike" temperature, or temperature at the center of the damaged cheese, was 62° F., which suggests that the cheese was subject to temperatures much higher than that outside the ship.

Because the refrigerator compartment is insulated, no air flow comes into the room unless vents are turned on in the engine room. While much of the ventilation system on the ship is automatic, ventilation is not automatic in the refrigerator compartment, but must be manually triggered. Although the engine room crew was under instructions to turn on the refrigerator room ventilation system every two hours, the ship's log does not show that this had been done and no record was kept of the temperature in the compartment. Moreover, the compartment adjoined the engine room, which is warmer than other areas of the ship. Furthermore, the temperature in the second refrigeration compartment would have been high also whenever its adjoining refrigeration compartment was being defrosted. (Testimony of Jean Sauvigne, marine surveyor who inspected the S.S. "Kastav")

In sum, plaintiff has established by a preponderance of the evidence that the cause of damage was excessive heat in the unrefrigerated compartment, not an inherent defect in the cheese and the failure of plaintiff to establish the internal condition of the cheese at the time of delivery to the ship does not preclude it from prevailing. As Judge Learned Hand stated in *Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha, supra,* a court is entitled to determine "[t]he most reasonable solution from the evidence." *Supra,* 102 F.2d at 451. Moreover, as the court noted in *Kupfermann v. United States,* "The statutory policy permitting a reliance upon bills of lading is an important one and should not be undermined . . . ." *Supra,* 227 F.2d at 350. This is not a case where the damage was shown to have been of internal origin. In contrast to the facts of *American Tobacco Co. v. Goulandris,* 281 F.2d 179, 182 (2d Cir. 1960), the presence of an inherent "vice" was only a possibility put forth by defendants. We find that the evidence does not support this theory, and that the weight of the evidence supports plaintiff's claim.

## II.

### Damages

It is undisputed that the sound market value of the cheese was $2.20 per pound. It was also agreed that the fair salvage sale price for the damaged cheese was $.70 per pound. Accordingly, defendant is liable to plaintiff for the value of the cheese if undamaged (132 cartons equaling 9,896.42 lbs. x $2.20) $21,772.12, less the salvage value, $6,972.42, for a subtotal of $14,799.70, plus the value of one carton of cheese which defendant concedes was not delivered (67.4 lbs. x $2.20) for a subtotal of $148.28, which together equals $14,947.98, plus interest at the legal rate from March 11, 1972.

This memorandum constitutes the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure.

Submit order on notice.