**TRAVELERS INDEMNITY COMPANY, Plaintiff,**

v.

**SS POLARLAND, her engines, boilers, etc., et al., Defendants.**

**No. 72 Civ. 3779.**

United States District Court, S. D. New York.

Aug. 17, 1976.

---

3. 500 F.2d 425–426.

Donovan, Donovan, Maloof & Walsh, New York City, for plaintiff; Charles C. Goodenough, Donald M. Kennedy, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for defendant Seven Seas Shipping Corp.; Enrico S. Sanfilippo, New York City, of counsel.

Walker & Corsa, New York City, for D/S A/S Vestland and SS Polarland; Richard A. Corwin, New York City, of counsel.

## OPINION

WEINFELD, District Judge.

Plaintiff, Travelers Indemnity Company ("Travelers") seeks as subrogee to recover $30,802.93 it paid to an assured for damage to a shipment of steel.

Nimpex International Inc. ("Nimpex") was the seller and shipper of 299 coils of cold rolled steel sheets of which Fabrique De Fer De Maubeuge ("Fabrique De Fer") of Louvroil, France, was the ultimate purchaser and consignee. The shipment, destined for delivery at Antwerp, Belgium, was insured by Travelers under an Open Marine Cargo policy in which Nimpex was named as the assured. Nimpex, as authorized under that type of policy, issued a certificate covering the shipment.[1] This certificate was endorsed in blank by Nimpex and together with other shipping documents was negotiated in due course to and acquired by Fabrique De Fer. Following the outturn of the steel cargo at Antwerp, Fabrique De Fer filed a claim with Travelers for damages to a portion of the shipment, which Travelers paid.[2]

The defendants from whom recovery is sought are SS Polarland, the vessel which carried the cargo from Cleveland, Ohio, to Antwerp; its owner D/S A/S Vestland ("Vestland") and Seven Seas Shipping Corp. ("Seven Seas"), the charterer of the vessel. The vessel had been bareboat chartered by Vestland, its owner, to Molena Trust Incorporated ("Molena") which in turn time chartered it to Ferrostaal A.G. of Essen, Germany.[3] The latter, as disponent owner, entered into a Uniform General Charter with Seven Seas as charterer, whereunder the SS Polarland was nominated to carry steel cargo from ports in the United States to European ports. That charter party provided that the cargo be "loaded, stowed, lashed and discharged by Charterers [sic] Stevedores free of expense to the vessel."

Seven Seas also entered into an agreement with Nimpex wherein Seven Seas was described as carrier and Nimpex as shipper. The agreement provided that a quantity of steel coils "which the Shippers agree to ship and the Carriers agree to carry" would be carried from Cleveland to Antwerp on board the SS Polarland. Seven Seas would profit one dollar a gross ton, the difference

---

1. The certificate is a negotiable document which is endorsed and passes with documents of title including bills of lading and invoices.

2. Originally the action was commenced by Nimpex, but during trial when it appeared that Travelers was the real party in interest it was substituted as plaintiff. See Link Aviation, Inc. v. Downs, 117 U.S.App.D.C. 40, 325 F.2d 613 (1963).

3. The complaint was dismissed as to Ferrostaal for lack of jurisdiction.

between the freight rate it was required to pay to Ferrostaal and what Nimpex paid to Seven Seas under the respective agreements.

The 299 coils of cold rolled steel sheets sold by Nimpex to Fabrique De Fer were delivered by railroad car from a mill in Sharon, Pennsylvania to the loading port, Cleveland, Ohio. Great Lakes International Corp. ("Great Lakes") was the exclusive stevedore at the Cleveland port for Seven Seas. Upon receipt of the shipment at the Cleveland terminal, Great Lakes issued dock receipts for the coils. The only exceptions noted by Great Lakes on the dock receipts with respect to the condition of the cargo related to twenty-six (26) coils, as follows:

Dock Receipt No. PC 752732 covering 10 coils—"coil wrappings rusty + chaffed—condition contents unknown"

Dock Receipt No. PRR 387050 covering 8 coils—"surface rust, paper covering torn, uncovered car"

Dock Receipt No. PRR 387151 covering 8 coils—"S/R P/C/T, OTC."

Great Lakes thereafter handled, loaded, stowed, lashed and chocked the coils aboard the SS Polarland.

World Shipping Inc. was the general agent of Seven Seas at the port of Cleveland. Bills of lading dated May 12, 1970 covering the shipment were signed by J. Reynolds, who was Assistant to the President of Seven Seas, under the words "World Shipping Inc. as Agent only by Authority of the Master." The bills of lading acknowledge receipt of the steel shipment on board the SS Polarland at Cleveland, Ohio, in good order and condition except that each was claused with the notation:

"Outer wrappers athmosperically [sic] rust stained. Outer wrappers slightly damaged. Some bands damaged and/or missing."

Whatever the merits of the parties' respective positions, it is clear that their rights and duties are governed by the Carriage of Goods by Sea Act ("Cogsa").[4] The plaintiff to establish a prima facie case must prove that the shipment was delivered aboard the SS Polarland at Cleveland, Ohio, in good order and condition except for the dock receipt notations as to the twenty-six (26) coils and the claused exceptions on the bills of lading referred to above, and that when delivered the damage sustained was of a nature, source and extent different from that noted on the dock receipts and bills of lading. Thereupon the defendants, to avoid liability, have the burden of establishing either that the damage was not due to their negligence or that it was the result of one of the "excepted causes" of Cogsa.[5] The bill of lading is prima facie evidence of the receipt by the carrier of the goods as therein described.[6]

Upon the vessel's arrival at Antwerp on or about June 6, 1970, and following inspection by independent surveyors designated by vessel and cargo interests, most of the coils in the shipment were found damaged. The surveyor appointed by the cargo interests testified at the trial. He was of considerable experience and his expertise was acknowledged by the defendants. He had inspected the shipment in the hold of the ship, and surveyed it in a closed hangar on a pier over a five-day period following discharge. The surveyor found that the damage fell within two categories. Sixteen (16) coils were heavily ovalized[7] and permanent-

---

4. 46 U.S.C. § 1300 *et seq. See Demsey & Associates v. S.S. Sea Star,* 461 F.2d 1009, 1014 (2d Cir. 1972); *Iligan International Corp. v. S.S. John Weyerhaeuser,* 372 F.Supp. 859, 865 (S.D. N.Y.), *aff'd and remanded sub nom. Iligan Integ. Steel Mills, Inc. v. S.S. John Weyerhaeuser,* 507 F.2d 68 (2d Cir. 1974), *cert. denied,* 421 U.S. 965, 95 S.Ct. 1954, 44 L.Ed.2d 452 (1975).

5. 46 U.S.C. § 1304(2), (3). *See also, Nichimen Co. v. M. V. Farland,* 462 F.2d 319, 325 (2d Cir. 1972); *Demsey & Associates v. S.S. Sea Star,*

461 F.2d 1009, 1014 (2d Cir. 1972); *cf. Mamiye Bros. v. Barber Steamship Lines, Inc.,* 241 F.Supp. 99, 109–12 (S.D.N.Y.1965), *aff'd,* 360 F.2d 774 (2d Cir.), *cert. denied,* 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966).

6. 46 U.S.C. § 1303(4).

7. Ovalized means that a circular coil has been deformed so that it rests on a flat bottom instead of the line of bearing—somewhat similar to a flat tire on an automobile.

ly deformed. These coils were rejected by the consignee as unfit for their intended use and sold for salvage at a loss of $10,-940.80. A second group of one hundred eighty-two (182) coils had been dented, bent, scratched, cut, waved, severely rusted, and slightly ovalized. These coils were found depreciated in value and an allowance in the sum of $19,862.13 was made by Travelers to the consignee, who agreed to accept those coils upon that allowance. The surveyor was of the opinion that the sum so paid to Fabrique De Fer for its claim was fair and reasonable.

In his view the cause of the damage was twofold: (1) Rough handling during loading and stowage, in that bottom coils were so stowed that they were crushed or ovalized when other coils were dumped on top of them, and (2) during the voyage, when some of the coils on the bottom tier were ovalized under the weight of overstowed coils stacked three high, and other coils were damaged by the shifting of coils in contact with one another. While he could not pinpoint when during the course of the pre-loading and loading handling the damage occurred, the expert was of the view that the packing was adequate and normal for the ocean transit of the coils.

The defendants sought to overcome the force of the surveyor's testimony by that of two experts. Neither had observed the actual condition of the coils but each testified in response to hypothetical questions. Their opinion evidence failed to undermine the eyewitness surveyor's testimony. The defendants' experts' theoretical concepts must yield to factual reality. Indeed the defendants' experts acknowledged that it is necessary to see the damaged coils to determine whether they are so ovalized as to render them unacceptable.

Significantly, the defendants failed to offer the testimony of the surveyor representing the vessel's interests who had jointly inspected and surveyed the cargo with the surveyor whose testimony the defendants now challenge. The latter submitted a copy of his written findings dealing with each coil to the vessel's surveyor who neither responded thereto nor took issue with the findings. Seven Seas contends that no inference should be drawn against it because the surveyor had been designated by the vessel defendants and not by it. However, although Seven Seas knew that the surveyor had been a participant in the joint survey, it failed to take or offer his testimony upon the trial. The witness, even though not under the direct control of Seven Seas, was subject to the process of the Court for the taking of his testimony. Since his testimony would upon the facts here presented have been cumulative to the testimony of the surveyor called by plaintiff, the failure of defendants to present his testimony by way of deposition or upon the trial permits an inference that his testimony would have been adverse to Seven Seas as well as to the other defendants.[8]

Defendants contend that some of the damaged merchandise could have been salvaged by a "jacking-up" process. Their evidence on this score was far from persuasive. While the consignee was required to take reasonable action to reduce its damages, "jacking-up" was not feasible considering the nature and extent of the deformity of the heavily ovalized coils. As plaintiff's expert put it, such a procedure would have served to disguise the damage without removing the deformity.

In sum, upon the totality of all the evidence, the Court accepts the testimony of plaintiff's surveyor upon the contested issues. The Court finds that the damage was of a nature and source different from that noted on the dock receipts and bills of lading and that plaintiff's subrogor, the consignee, sustained the damage described which plaintiff paid. The Court further finds that the defendants failed to rebut plaintiff's prima facie case.

The issue remains as to who is liable for the damage.

8. See J. Gerber & Co. v. S.S. Sabine Howaldt, 437 F.2d 580, 593 (2d Cir. 1971); cf. Armstrong v. Commerce Tankers Corp., 311 F.Supp. 1236, 1242–43 (S.D.N.Y.1969), aff'd, 423 F.2d 957 (2d Cir.), cert. denied, 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970).

## (a) Seven Seas

The documentary evidence abundantly establishes that Seven Seas was the carrier of the coils and as such was under a duty to properly load, handle, stow and discharge the goods carried.[9] Under the charter party with Ferrostaal, Seven Seas was obligated to load and stow the cargo. That charter party also provided that Seven Seas should appoint its own broker or agent at the port of loading and the port of discharge. The bills of lading were signed for World Shipping Inc., Seven Seas' general agent at the Cleveland port, by J. Reynolds, Assistant to the President of Seven Seas, whose authority extended to anything required to assist the President. Reynolds had authority to sign bills of lading on behalf of Seven Seas on Seven Seas forms. The evidence and contemporaneous events establish that Reynolds was acting within the scope of his authority as an employee of Seven Seas and for and on its behalf in signing the bills of lading.

Additionally, the contract between Seven Seas and Nimpex covering the shipment at issue was prepared by Seven Seas and described Seven Seas as the carrier. Pursuant to the contract, Seven Seas was paid $32,005.36 by Nimpex for ocean freight and seaway tolls. Significantly, a pre-printed portion of that contract which would have made it Nimpex' risk and responsibility to load, stow, lash and chock the shipment was stricken therefrom on instructions of Seven Seas' President. Great Lakes, which was Seven Seas' exclusive stevedore at Cleveland, loaded and stowed the Nimpex shipment aboard the vessel upon the instructions of Seven Seas' President and for and on Seven Seas' behalf. Further, Nimpex had no agreement with Great Lakes or any other stevedore for loading the shipment aboard the vessel.

The evidence also establishes that Seven Seas held itself out to the public as a carrier. Cargoes of other shippers were carried on the voyage in question, for which Seven Seas collected freight charges from those shippers.

Despite the overwhelming evidence,[10] Seven Seas disclaims that it was the carrier and attempts to negate the clear and plain meaning of documents, its own acts and conduct and those of its agents with respect to the shipment. This it sought to do by the oral testimony of its President upon the trial. He denied that Great Lakes loaded the shipment aboard the vessel at the direction of or for the account of Seven Seas; he claimed it did so for Nimpex. He denied that World Shipping was Seven Seas' agent at Cleveland for the purpose of this shipment; he claimed that World Shipping was acting for Ferrostaal. He denied that Reynolds signed the bills of lading on behalf of Seven Seas; he claimed that Reynolds did so on behalf of World Shipping. Finally, he claimed that Ferrostaal, and not Seven Seas, was the carrier of the cargo. The manner of his testimony and his demeanor was such that during the course of his testimony this Court stated that the teaching of *Dyer v. MacDougall*[11] would come into play. A post-trial word-by-word reading and study of his testimony, as well as of the entire trial record and all relevant exhibits, confirm the Court's initial evaluation of this witness' credibility. He was glib and evasive, oft times with an agility to give an anticipatory answer designed to exonerate Seven Seas of its obligations, of which he was well aware. At times his answers were in utter disregard of compelling documentary proof and of established relationships; at other times they were in flat contradiction of his own prior statements and admissions. This Court rejects the substance of his testimony as a palpable effort to escape the legal consequences of various agreements which Seven Seas entered into with the respective parties.

Accordingly, Seven Seas, as the carrier of the cargo, is held liable for the damage

9. 46 U.S.C. § 1303(2).

10. See *Joseph L. Wilmotte & Co., Inc. v. Cobelfret Lines, S.P.L.R.,* 289 F.Supp. 601 (M.D.Fla. 1968); *cf. Pendleton v. Benner Line,* 246 U.S. 353, 355, 38 S.Ct. 330, 62 L.Ed. 770 (1918).

11. 201 F.2d 265, 268–69 (2d Cir. 1952).

caused by the improper loading and stowage.

### (b) The vessel, SS Polarland

The vessel also is liable for the cargo damage and a maritime lien may be enforced against it. The fact that the vessel was operated under the charter to Seven Seas does not affect the liability of the vessel.[12] Nor is her liability affected by the fact that the master personally did not sign the bills of lading; neither does it matter that Reynolds in signing the bills of lading acted on behalf of Seven Seas, the charterer, or, as Seven Seas has contended, on behalf of Ferrostaal, the disponent owner of the vessel. Once the vessel set sail with its cargo, this constituted a ratification by the master of the bills of lading covering cargo aboard.[13]

The vessel, having been cast in rem liability by reason of the acts and conduct of Seven Seas, is entitled to recover from it the amount of the maritime lien against it as well as reasonable counsel fees incurred in the defense of the action.[14]

### (c) D/S A/S Vestland, the owner of the vessel

There remains the question of whether Vestland, the owner of the vessel, is also liable in personam. As previously noted, Vestland had bareboat chartered the vessel to Molena, which in turn time chartered it to Ferrostaal, which then entered into the Uniform General Charter with Seven Seas whereunder the vessel was nominated to carry the steel cargo. The charter party between Vestland and Molena provided that Molena would "by its own procurement, man, victual, navigate, fuel and lubricate and supply the vessel . . . ."

Vestland entered into no relationship, contractual or otherwise, with Nimpex, the shipper, and in the circumstances of this case cannot be deemed a carrier subject to the responsibilities and liabilities of Cogsa. Nimpex' contract for carriage was exclusively with Seven Seas and not with Vestland, the owner of the vessel. Moreover, Reynolds signed the bills of lading as an employee of and on behalf of Seven Seas and not on behalf of Vestland.

Vestland is not liable in personam for the damages sustained and is entitled to judgment dismissing the complaint against it.[15]

The foregoing shall constitute the Court's findings of fact and conclusions of law. If the parties do not agree as to the amount of counsel fees allowed the vessel, the matter may be noticed for hearing on that issue to be held no later than fifteen (15) days from date. Judgment may be entered accordingly.

12. *Demsey & Associates v. S.S. Sea Star,* 461 F.2d 1009, 1014 (2d Cir. 1972); *Pioneer Import Corp. v. The Lafcomo,* 49 F.Supp. 559, 561–62 (S.D.N.Y.), *aff'd,* 138 F.2d 907 (2d Cir. 1943), *cert. denied sub nom. Black Diamond Lines, Inc. v. Pioneer Import Corp.,* 321 U.S. 766, 64 S.Ct. 523, 88 L.Ed. 1063 (1944).

13. *Demsey & Associates v. S.S. Sea Star,* 461 F.2d 1009, 1015 (2d Cir. 1972). *See also Tube Products of India v. S.S. Rio Grande,* 334 F.Supp. 1039, 1041 (S.D.N.Y.1971); *United Nations Children's Fund v. S/S Nordstern,* 251 F.Supp. 833, 836–38 (S.D.N.Y.1965); *The Muskegon,* 10 F.2d 817, 819–21 (S.D.N.Y.1924); *The Blandon,* 287 F. 722, 723–24 (S.D.N.Y. 1922).

14. *Nichimen Co. v. M.V. Farland,* 462 F.2d 319, 330–34 (2d Cir. 1972); *A/S Brovanor v. Central Gulf Steamship Corp.,* 323 F.Supp. 1029, 1033 (S.D.N.Y.1970).

15. *See Nichimen Co. v. M.V. Farland,* 462 F.2d 319, 330 n. 10 (2d Cir. 1972); *Armour & Co. v. Fort Morgan S.S. Co.,* 297 F. 813 (5th Cir. 1924), *aff'd,* 270 U.S. 253, 46 S.Ct. 212, 70 L.Ed. 571 (1926). *See also Associated Metals & Minerals Corp. v. SS Portoria,* 484 F.2d 460 (5th Cir. 1973); *Demsey & Associates v. S.S. Sea Star,* 461 F.2d 1009, 1015 (2d Cir. 1972); Scrutton on Charterparties and Bills of Lading 67 (18th Ed. 1974).