**JAMAICA NUTRITION HOLDINGS, LTD., Plaintiff,**

v.

**GREAT CIRCLE SHIPPING, INC., et al., Defendants.**

**Civ. A. No. 76–116–T.**

United States District Court, S. D. Alabama, S. D.

June 28, 1977.

G. Hamp Uzzelle, III, Mobile, Ala., for plaintiff.

Sidney H. Schell, Mobile, Ala., for defendants.

DANIEL HOLCOMBE THOMAS, Senior District Judge.

The above-styled cause was heard by the Court without a jury and taken under submission on May 3, 1977. The Court, having considered the pleadings and evidence presented at the trial, makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. The plaintiff, Jamaica Nutrition Holdings, Ltd. (JNH) is a corporation owned by the government of Jamaica, W.I. It was established in 1974 to insure that adequate quantities of basic commodities were available in Jamaica at the govern-

ment's fixed prices. (D. Ex. Nos. 4 and 5)[1] Pursuant to this goal, JNH in 1975 bought a quantity of flour from the ADM Milling Company. The flour was delivered to Mobile, Alabama, for shipment to Jamaica.

2. The flour was loaded aboard the M/V MARTHA S on March 1, 1975. The defendant, Great Circle Shipping Inc., is the owner and operator of the MARTHA S. None of the other fictitious or *in rem* defendants have been served.

3. The bills of lading provided that the cargo described therein was received from the shipper "in apparent good order and condition unless otherwise indicated in this bill of lading, to be transported to the port of discharge and there to be delivered. . . ." The bills of lading issued on behalf of the defendant by its agent on March 1, 1975, are clean and reflect no discrepancies or damage to the cargo at the time it was delivered to the defendant for shipment. The plaintiff is designated as both shipper and consignee. The bills of lading incorporated the terms of the Carriage of Goods by Sea Act. (P. Ex. Nos. 3, 4, and 9). Although the shipment consisted of two types of flour, only the flour shipped under Bill of Lading No. 2 (P. Ex. Nos. 4 and 9) is the subject of the present action. Bill of Lading No. 2 was for 39,553 paper bags of wheat flour. Each bag contained 100 pounds of flour. The ocean freight was prepaid.

4. It is contended by the defendant that shipment in paper bags constituted inadequate packaging. However, no evidence was introduced to support this contention. To the contrary, there is evidence to the effect that this is the usual packaging for flour shipments from the United States. The Court finds that the flour was adequately packaged.

5. The MARTHA S arrived in Kingston, Jamaica, on March 6, 1975, and discharged the flour during the period of March 7 through March 13, 1975. The flour was carried break bulk and discharged by the stevedore by placing on pallets in the ship's hold and placing the pallets onto the dock alongside the ship. The pallets were then picked up by fork trucks owned and operated by the terminal operator, Western Terminals, Ltd., and carried into Western's adjoining warehouse.

6. Western Terminals, Ltd. is a privately owned company which operates under published tariffs and is open to the public for business. The dock where the flour was discharged and the warehouse where it was stored were owned by Western. The stevedore was Jamaica Terminal Operators, Ltd. Both were selected and engaged by the vessel's agent in Jamaica, Lasocean Agencies, Ltd. The stevedore was paid by Lasocean. Western received the cargo for Lasocean for later delivery to JNH. Western's charges were to be paid by JNH, but it should be noted that Western looked to Lasocean for instructions in receiving the cargo and also for payment if JNH failed to pay the cargo warehousing costs. Western was acting as the vessel's agent for delivery to JNH.

7. Before commencing the discharge of the cargo, the stevedore noticed that a large number of the flour bags were torn and leaking. The condition was reported and some minor recoopering was apparently done in the ship's hold. However, during discharge so much flour was escaping that the longshoremen sought, and were granted, additional compensation to work under the uncomfortable conditions created by the flour dust. (P. Ex. No. 5) Western's discrepancy clerk also noticed and reported the torn and leaking bags. No exact count of the number of damaged bags was made since any torn bags within the palletized groupings would be concealed from sight. The discrepancy clerk prepared a bad order list which noted the fact that the bags were landed torn with "contents issuing". (P. Ex. 1, p. 14) It is a common practice for Western to describe the problem on the bad order list without listing the number of

---

1. References to "D. Ex." or "P. Ex." are to the exhibits of the defendant or plaintiff, respectively, that were made a part of the depositions introduced into evidence at the trial of this case. The Court retains the same exhibit numbers as used in the depositions.

units affected, when the number is obviously very large. (Testimony of Anthony Dunbar) ·The vessel's agent refused to sign the bad order list when it was presented on completion of discharge· on March 13, 1975.

8. While no one knew at the time just how many or when the bags were torn, there is clear and convincing evidence that they were certainly torn and leaking before and during discharge. There is no direct evidence that any were torn while being moved into or out of Western's warehouse, although it was admitted that this was possible. In addition there is testimony that it is highly unlikely that more than the odd bag or two were torn while being delivered to JNH's customers. Therefore, the preponderance of ·the evidence is, and the Court so finds, that all of the bags later found to be torn and contaminated were damaged before or during their discharge from the MARTHA S.

9. A government food inspector was present at various times during discharge and upon noticing that many of the flour bags were torn, instructed Western to hold any torn bags ·and not allow them to be delivered. When the flour was delivered from Western's warehouse to JNH's customers, any torn bags found while loading were held back pursuant to this request and the customers' natural reluctance to accept torn flour bags. The food inspector subsequently found that a total of 1,773 bags of flour were unfit for human consumption because they were badly torn and the contents were contaminated. This total included not only those found while discharging the cargo but also those found while delivering the flour to JNH's customers. The 1,773 bags were seized by the inspector and later destroyed. (P. Ex. No. 7, "Certificate of Food Seizures" No. 2348) Although attempts were made by JNH to sell the flour as animal feed, its high starch content made this impossible. (Testimony of Albert Ramsay) The Court finds that the flour was not subject to salvage for an alternate use.

10. Delivery of the flour to JNH began on March 10, 1975, and was completed on March 21, 1975. Delivery was made to JNH's customers who were issued gate receipts or delivery tickets which were then presented at the warehouse where they were allowed to load the specified amount of flour. However, only a total of 36,266 bags were delivered from the warehouse to JNH's customers. (testimony of Lloyd Dunbar) Combined with the 1,773 bags seized by the food inspector, this left 1,514 bags unaccounted for. A tally was made during discharge which showed that 38,987 bags were discharged into the warehouse and that 567 bags were shortlanded. Since the bill of lading showed 39,553 bags were delivered to the defendant, this leaves 947 bags which were delivered to the defendant for shipment but were unaccounted for. The tally made during discharge was obviously incorrect. The defendant's agent issued the plaintiff a clean bill of lading which claimed no discrepancies. Defendant ·has no explanation for the missing bags. Therefore, the Court finds that defendant failed to deliver 1,514 bags of the 39,553 bags of flour delivered to it for shipment. The Court further finds that defendant also damaged and caused to be seized and destroyed an additional 1,773 bags of flour delivered to it by the plaintiff for shipment.

11. Defendant received no formal or written notice of the loss within three days of delivery. Defendant did, however, have access to the tally sheets and bad order list prepared by Western, and presented to its agent in Jamaica, Lasocean.

12. All of the flour delivered to JNH was sold at the government's fixed price of $16.50 Jamaican per bag. The flour JNH failed to receive was also sold in advance for this price, and credit in the amount of $16.50 Jamaican per bag had to be given to JNH's customers who failed to receive the amount promised them. The Court is of the opinion that the fact that the· government of Jamaica had set a price for flour sold in Jamaica, and the fact that the flour in question had in fact been sold in advance at that price is sufficient to establish a market price of $16.50 Jamaican for the flour the defendant failed to deliver or damaged before delivery to the plaintiff.

13. The prevailing rate of exchange during the time in question was $0.9125 Jamaican equalled $1.00 U.S. (Agreed Fact No. 9, Pretrial Order signed and filed by the parties on January 24, 1977) Therefore, the value of each bag lost or damaged by the defendant was $18.082191 U.S.

14. The Court finds the loss suffered by the plaintiff to be 1,773 bags of flour seized and destroyed, $32,059.72; 1,514 bags shipped by the plaintiff but not delivered by the defendant, $27,376.43; or a total of $59,436.15.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this cause by virtue of the admiralty and maritime jurisdiction conferred by 28 U.S.C. § 1333. None of the named *in rem* defendants or unnamed fictitious defendants having been served, the only defendant in this cause is Great Circle Shipping, Inc.

2. The bill of lading covering the cargo in question having incorporated the Carriage of Goods by Sea Act (COGSA), the Court finds that the Act is applicable to the loss claimed herein. 46 U.S.C. §§ 1300, *et seq.*

3. Section 3 of COGSA places upon the carrier the duty to ". . . properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." 46 U.S.C. § 1303(2). As found by the Court and noted above, defendant carrier failed to fulfill this duty and is therefore liable to the shipper, JNH, for the damage caused by its failure to properly care for the flour cargo entrusted to it. The plaintiff is entitled to recover from Great Circle the market value of the 1,773 bags of flour found to have been torn and contaminated before and during discharge.

4. The bill of lading is sufficient to establish *prima facie* that the amount stated therein was in fact delivered to the carrier. 46 U.S.C. § 1303(3), (4). Defendant failed to rebut this *prima facie* showing. Western Terminals, Ltd. was acting in this situation as the carrier's agent for delivery of the flour cargo to JNH. This placed the carrier in the position of a bailee as to the goods held in Western's warehouse for delivery to JNH. Therefore, Great Circle is liable to JNH for the 1,514 bags of flour which it accepted for shipment and delivery to JNH but were in fact never delivered to JNH, even though the discharge tally sheets and the evidence did not establish at exactly what point after acceptance by the carrier the flour was lost. *Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800(2nd Cir. 1971); *Toyomenka, Inc. v. S.S. Tosaharu Maru,* 392 F.Supp. 450 (S.D.N.Y.1974), rev'd on other grounds, 523 F.2d 518 (2nd Cir. 1975); *Royal Typewriter Co. v. M/V Kulmerland,* 346 F.Supp. 1019 (S.D.N.Y. 1972), aff'd 483 F.2d 645 (2nd Cir. 1973).

5. Defendant's defense of failure to give notice of loss or damage is insufficient to defeat recovery by JNH. Section 3 of COGSA states that such a failure to give notice is only evidence of delivery. 46 U.S.C. § 1303(6). There is ample evidence to defeat this presumption and to establish that the cargo was not in fact delivered to the plaintiff.

6. Plaintiff is entitled to recover from the defendant the market value of the entire 3,287 bags of flour. That amount was found to be $59,436.15.

7. Interest at the rate of 6% (six per cent) should be assessed against the defendant from the date the flour should have been delivered, March 21, 1975.

A judgment in accordance with the above Findings and Conclusions will be entered.