C.´ITOH & CO. (AMERICA), INC., Plaintiff,

v.

HELLENIC LINES, LTD., Universal Cargo Carrier, Inc. and S/S Hellenic Star, her engines, boilers, etc., Defendants.

No. 78 Civil 1695.

United States District Court, S. D. New York.

May 4, 1979.

---

McHugh, Heckman, Smith & Leonard, New York City, for plaintiff; John P. Conroy, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant Hellenic Lines Ltd.; Linda B. Bridgman, Manuel R. Llorca, Chester D. Hooper, New York City, of counsel.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

Plaintiff, C. Itoh & Co. (America), Inc., the consignee of a shipment of 247 cartons of leather cowboy boots, seeks recovery of

damages for their outturn in damaged condition from the carrier, Hellenic Lines Ltd., under the Carriage of Goods by Sea Act ("COGSA").[1] On August 18, 1974, at Calcutta, India, the cargo was loaded on board the S.S. Hellenic Star for delivery to New York. A clean bill of lading noting apparent good order and condition was issued by the carrier and the cargo was stowed in the No. 1 Hatch. The vessel arrived at a pier in New York City on October 4, 1974; plaintiff's trucker picked up the goods at the pier on October 10–11 against the following exceptions noted in Hellenic Lines' delivery book:

101 cartons wet stain
28 cartons wet stain and recoopered intact
61 cartons recoopered intact
1 carton No. 1833 recoopered 17 pair in.

The goods were delivered to a warehouse where they were inspected by a surveyor designated by plaintiff. Although defendant was invited to attend and participate in a joint survey, it failed to do so.[2] The contents of the 129 wet-stained cartons were eventually sold for salvage and the instant suit followed.

■ Plaintiff establishes a prima facie case under COGSA by proof of delivery of the cargo to the carrier in good condition and its outturn at destination in damaged condition.[3] The burden then shifts to the carrier to prove "(1) that the harm resulted from an 'excepted cause' for which the carrier was not liable, or (2) that it exercised due diligence to avoid and prevent the harm." [4]

Plaintiff relies on the clean bill of lading "[as] prima facie evidence of the receipt by the carrier of the goods as therein described." [5] To prove bad order on outturn, plaintiff offers the exceptions noted in the delivery book at defendant's pier and the survey report and testimony of Albert Cameron, its designated surveyor. Cameron, who inspected the goods on October 18, December 11, and January 10, testified that he found a representative sampling of the boots to be wet-stained and mildewed to varying degrees; that in his opinion, the damage was caused by a moderate, freshwater wetting.

■ Defendant, rather than attempting to prove due care, challenges the sufficiency of plaintiff's prima facie case. It contends that the clean bill of lading only attests to the external condition of the cargo and that plaintiff must prove the actual good order of the contents of the cartons on delivery to the carrier. It is true that in the case of perishable property or when the

1. 46 U.S.C. §§ 1300 et seq.

2. Although defendant initially contended that no notice of the survey had been given, plaintiff introduced at trial a carbon copy of the letter by its representative, Toplis and Harding, Inc., dated October 23, 1974, inviting defendant to participate in a joint survey of the cargo and requesting a prompt reply. Defendant offered no explanation of its failure to respond to this letter or to request its own survey following receipt of plaintiff's notice of claim dated October 11, 1974. See Konfort, S. A. v. The S.S. Santa Cerro, 190 F.Supp. 1, 5 (S.D.N.Y.1960); Tuteur & Co. v. The Ittersum, 162 F.Supp. 788, 790 (E.D.La.1958), aff'd, 267 F.2d 310 (5th Cir. 1959).

3. Vana Trading Co. v. S.S. "Mette Skou," 556 F.2d 100, 104 (2d Cir.), cert. denied, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977); Travelers Indem. Co. v. SS Polarland, 418 F.Supp. 985, 987 (S.D.N.Y.1976), aff'd mem., 562 F.2d 39 (2d Cir. 1977); American Tobacco Co. v. The Katingo Hadjipatera, 81 F.Supp. 438, 445 (S.D.N.Y.1948), aff'd, 194 F.2d 449 (2d Cir. 1951), cert. denied, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952).

4. General Foods Corp. v. The Troubador, 98 F.Supp. 207, 209 (S.D.N.Y.1951); accord, Schnell v. The Vallescura, 293 U.S. 296, 303, 55 S.Ct. 194, 79 L.Ed. 373 (1934); Vana Trading Co. v. S.S. "Mette Skou," 556 F.2d 100, 105 (2d Cir.), cert. denied, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977); Paul Marsh, Inc. v. S.S. Johann Blumenthal, 455 F.Supp. 236 (S.D.N.Y. 1978); see 46 U.S.C. § 1304(2), (3).

5. 46 U.S.C. § 1303(4); see Hecht, Levis & Kahn, Inc. v. The S.S. President Buchanan, 236 F.2d 627, 631 (2d Cir. 1956); Kupfermann v. United States, 227 F.2d 348 (2d Cir. 1955); Travelers Indem. Co. v. SS Polarland, 418 F.Supp. 985, 987 (S.D.N.Y.1976), aff'd mem., 562 F.2d 39 (2d Cir. 1977); S. M. Sartori, Inc. v. S.S. Kastav, 412 F.Supp. 1181, 1183 (S.D.N.Y. 1976).

"goods themselves contain some basic, inherent, and hidden defect," a clean bill alone will not suffice.[6] But defendant points to no such properties in the goods at issue. Moreover, even with respect to perishable cargo, a plaintiff may satisfy its burden of proof by showing "from the condition of the cargo as delivered or otherwise, that the damage was caused by the carrier's negligence and not by any inherent vice in the cargo."[7]

Here leather boots, packed one pair per single-wall cardboard box and eighteen pairs to a multi-wall corrugated cardboard carton, were delivered to the vessel for loading on August 18. According to the ship's log, it rained in Calcutta on all but one day from August 7–14 and again on August 19. If the wetting had occurred prior to delivery of the cargo to the carrier, the corrugated cartons would have been wetted and water stained as they were on outturn.[8] But the clean bill of lading negates this theory of the cause of damage. Defendant's suggestion at trial that the boots were packed wet and, because of their hygroscopic nature, transmitted moisture outward staining the cartons, is sheer speculation.[9] Apart from the fact that it is without the slightest evidentiary support, this theory is rebutted by Cameron's testimony, which the Court finds credible, that

the pattern of staining indicates the source of the wetting was external.

▉ Defendant also contests plaintiff's proof of outturn in damaged condition. Here defendant claims entitlement to a "presumption" of delivery in good order because the trucker's exceptions were to the master cartons only with no notations as to the condition of their contents and because Cameron's initial survey of the boots themselves did not occur until October 18, beyond the three-day period allowed by COGSA for notifying the carrier of damage not apparent at delivery.[10] Defendant's formalistic reading of the COGSA notice provision must yield to the facts. Within a day after discharge of the cargo to the trucker, defendant had written notice of plaintiff's intent to enter a claim for approximately "90 cases crushed and damaged and wet"; shortly thereafter it was invited to participate in a joint survey of the cargo but failed to do so.

Moreover, lack of notification of loss or damage is only prima facie evidence of good order on outturn and may be rebutted.[11] Plaintiff has provided ample proof that the cargo was discharged damaged. The trucker's exceptions, identifying water damage to 129 master cartons, were confirmed by

---

6. *Kupfermann v. United States,* 227 F.2d 348, 350 (2d Cir. 1955); *accord, American Tobacco Co. v. Goulandris,* 281 F.2d 179 (2d Cir. 1960) (tobacco); *Hecht, Levis & Kahn, Inc. v. The S.S. President Buchanan,* 236 F.2d 627, 631 (2d Cir. 1956) (crude rubber); *The Neil Maersk,* 91 F.2d 932 (2d Cir.), *cert. denied,* 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582 (1937) (sardine meal); *Arista Indus. v. S.S. Export Agent,* 1978 A.M.C. 2128 (S.D.N.Y.1978) (lobster tails).

7. *Vana Trading Co. v. S.S. "Mette Skou,"* 556 F.2d 100, 105 n.8 (2d Cir.), *cert. denied,* 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977); *see Compagnie De Navigation Fraissinet & Cyprien Fabre, S. A. v. Mondial United Corp.,* 316 F.2d 163, 170 (5th Cir. 1963); *Yeckes-Eichenbaum, Inc. v. Texas Mexican Ry.,* 263 F.2d 791, 794 (5th Cir.), *cert. denied,* 361 U.S. 827, 80 S.Ct. 75, 4 L.Ed.2d 70 (1959); *Kupfermann v. United States,* 227 F.2d 348, 349 (2d Cir. 1955); *Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha,* 102 F.2d 450, 451–52 (2d Cir. 1939); *S. M. Sartori, Inc. v. S.S. Kastav,* 412 F.Supp. 1181 (S.D.N.Y.1976); *General Foods*

*Corp. v. The Troubador,* 98 F.Supp. 207, 209 (S.D.N.Y.1951).

8. *Cf. Empire Aluminum Corp. v. SS Korendijk,* 391 F.Supp. 402, 412 (S.D.Ga.1973).

9. *Cf. Compagnie De Navigation Fraissinet & Cyprien Fabre, S. A. v. Mondial United Corp.,* 316 F.2d 163, 169–70 (5th Cir. 1963) (negating similar theory); *Konfort, S. A. v. The S.S. Santa Cerro,* 190 F.Supp. 1, 7 (S.D.N.Y.1960) ("It seems hardly likely that . . . a responsible corporation, would deliberately wrap and tie up wire that it knew to be rusty.").

10. 46 U.S.C. § 1303(6).

11. *Socony Mobil Oil Co. v. Texas Coastal & Intern., Inc.,* 559 F.2d 1008, 1012 (5th Cir. 1977); *M. W. Zack v. The S.S. Birmingham City,* 291 F.2d 451, 453–54 (2d Cir. 1961); *Jamaica Nutrition Holdings, Ltd. v. Great Circle Shipping, Inc.,* 433 F.Supp. 1067, 1071 (S.D.Ala. 1977).

Cameron's survey of the contents. In this instance too, defendant's theory that the cargo was wetted after it relinquished control of the shipment and before the survey is sheer speculation and fails to explain the change in the external appearance of the cartons between loading in Calcutta and discharge in New York. In short, plaintiff has established a prima facie case of liability. Defendant has offered no explanation for the damage that occurred, but "the law casts upon him the burden of the loss which he cannot explain or, explaining, bring within the exceptional case in which he is relieved from liability." [12]

■ We next consider the question of damages. The usual measure is the difference between the fair market value of the goods at the port of destination in the condition they were in when shipped and their value as damaged. [13] Plaintiff, in support of its burden of proof on this issue, [14] offers the deposition testimony of Ray Levine, its Vice-President in the footwear department, as to the fair market value of sound leather boots in infant, child, and youth sizes in the fall of 1974. The proceeds of the salvage sale, $1,741.50, are offered as evidence of their value as damaged. But in the circumstances of this case, it is not a fair measure of value for reasons discussed in considering the defendant's plea of mitigation of damages.

■ Although plaintiff purchased the boots for resale to retail stores, it had not arranged for sale prior to their receipt. No record of the eventual disposition of the undamaged portion of the shipment was produced at trial, which might have afforded some evidence of fair value at the port of New York at the time of delivery. Instead Levine relied upon records of allegedly comparable sales during the relevant time period by the Bay-Bee Shoe Company, Inc., a Tennessee manufacturer of children's cowboy boots. But the relevant market for valuation purposes is New York and there is no evidence that Bay-Bee's records reflect sales in the relevant market. Moreover, Levine's estimates are not readily derived from the source on which he purportedly relied. [15] Bay-Bee's records show a range in price both within each size category, depending on the pattern of the boot, and between the size categories. In contrast, Levine gave a single price per boot size without reference to the pattern of plaintiff's boots, and a range in price between sizes that bears no correlation to the Bay-Bee figures. These discrepancies, coupled with Levine's lack of any independent knowledge of the value of children's boots, render his testimony of questionable probative force.

■ Contrary to defendant's assertion, however, this uncertainty in ascertaining damages "does not mean that plaintiff is to be deprived of a recovery." [16] An alternative reference point in determining value, and one which this Court deems fair, is the invoice price for the boots plus that portion of the freight costs attributable to the 129 damaged cartons. [17] This yields a sound

12. *Schnell v. The Vallescura*, 293 U.S. 296, 304, 55 S.Ct. 194, 196, 79 L.Ed. 373 (1934).

13. *Encyclopedia Britannica, Inc. v. SS Hong Kong Producer*, 422 F.2d 7, 18 (2d Cir. 1969), cert. denied, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970); *Santiago v. Sea-Land Serv., Inc.,* 366 F.Supp. 1309, 1314 (D.P.R. 1973); *Interstate Steel Corp. v. S.S. "Crystal Gem,"* 317 F.Supp. 112, 121 (S.D.N.Y.1970).

14. *See O'Brien Bros. v. The Helen B. Moran*, 160 F.2d 502, 504–05 (2d Cir. 1974); *Weirton Steel Co. v. Isbrandtsen-Moller Co.*, 126 F.2d 593, 594 (2d Cir. 1942); *Interstate Steel Corp. v. S.S. "Crystal Gem,"* 317 F.Supp. 112, 121 (S.D.N.Y.1970).

15. The Bay-Bee Company priced infant boots at $2.90, $3.10 and $3.70, depending on pattern. Sizes 8½-3 were priced at $5.10, $5.30 and $5.62. Levine estimated the value of plaintiff's infant, child and youth size boots at $5.10, $5.50 and $5.60.

16. *For Children, Inc. v. Graphics Int'l, Inc.*, 352 F.Supp. 1280, 1284 (S.D.N.Y.1972).

17. *Emmco Ins. Co. v. Wallenius Caribbean Line, S. A.*, 402 F.2d 508, 514 (5th Cir. 1974); *Empresa Central Mer. De R. v. Republic of U. S. of Brazil*, 257 F.2d 747, 749 (2d Cir. 1958); *Tatlow & Pledger (PTY), Ltd. v. Hermann Forwarding Co.*, 456 F.Supp. 351, 355 (S.D.N.Y. 1978); *Dixie Plywood Co. v. S.S. Federal Lakes*, 404 F.Supp. 461, 466 (S.D.Ga.), aff'd,

market valuation of $8,835.98.[18]  Subtracting the proceeds of the salvage sale results in damages of $7,094.48, subject to the mitigation factor to which we now turn.

"While the duty to mitigate damages lay with [the cargo owner], the burden to show failure to mitigate is upon the [carrier]."[19] Testifying for the defendant, A. Paul Toran, a marine surveyor specializing in raw and finished leather products, stated that within seven weeks after a moderate wetting of cargo as packaged here, some degree of penetration to the inner boxes with resulting stain and mold to the boots themselves would be expected.  A portion of the boots would be unrestorable but others could be reconditioned if aired and talced. If instead the cargo remained in the wet cartons, the mold and wet staining would spread, harming previously sound boots and rendering lightly damaged ones unrestorable.

Although the wet cartons were segregated in the warehouse following the initial inspection of the cargo by plaintiff's representative Cameron on October 18, Cameron did not request a complete unpacking of the damaged cartons and separation of the wet from sound boots until December 23.  On joint examination of the cargo on January 10, 1975, Cameron and Mark Flanders, risk manager for plaintiff, agreed that in view of the expense of unpacking the goods, the extent of the damage at that time, and the value of the merchandise, the best solution was to send the damaged boots to a salvor for sale at the best price available.  The salvage sale took place in April 1975.

Cameron's failure to request segregation of the wet boots for two months after his initial survey, the substantial delay before the salvage sale, and Toran's testimony, which the Court finds credible, as to the progressive nature of the damage, establish plaintiff's failure to take reasonable steps to minimize its losses.  The record does not show with any precision, however, the extent to which the damages could have been reduced except for plaintiff's neglect—an issue on which defendant also bears the burden of proof.[20]  Not having viewed the cargo, Toran could only guess the percentage of the boots that could have been restored at various time periods.[21] The extent of damage is, of course, relevant in determining the actual reconditioning costs, a factor which Toran conceded should be weighed against the value of the boots in determining whether to sell them for salvage or attempt to restore them.[22]  None-

525 F.2d 691 (5th Cir. 1975), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2174, 48 L.Ed.2d 798 (1976).

**18.** Multiplying the invoice price for each size boot by the number of damaged pairs of each size yields $7,338.60:

| Infant: | $2.55 × | 18 pairs | = | $ 45.90 |
| Child: | $2.90 × | 558 pairs | = | 1618.20 |
| Youth: | $3.25 × | 1746 pairs | = | 5674.50 |
| Total: | | | | $7338.60 |

The total freight cost for 247 cartons was $2,867.08; the portion of that cost attributable to the 129 damaged cartons is $1,497.38.  The total of invoice price and freight cost equals $8,835.98.

**19.** *Emmco Ins. Co. v. Wallenius Caribbean Line, S. A.*, 492 F.2d 508, 514 (5th Cir. 1974); accord, *Compagnie De Navigation Fraissinet & Cyprien Fabre, S. A. v. Mondial United Corp.*, 316 F.2d 163, 171 (5th Cir. 1963); *Dixie Plywood Co. v. S.S. Federal Lakes*, 404 F.Supp. 461, 465 (S.D.Ga.), aff'd, 525 F.2d 691 (5th Cir. 1975), cert. denied, 425 U.S. 974, 96 S.Ct. 2174, 48 L.Ed.2d 798 (1976); *Empresa Central Mer. De R. v. Republic of U. S. of Brazil*, 147 F.Supp.

778 (S.D.N.Y.1957), aff'd, 257 F.2d 747 (2d Cir. 1958).

**20.** *See Compagnie De Navigation Fraissinet & Cyprien Fabre, S. A. v. Mondial United Corp.*, 316 F.2d 163, 171 (5th Cir. 1963); *Empresa Central Mer. De R. v. Republic of U. S. of Brazil*, 257 F.2d 747, 749 (2d Cir. 1958); *Armco Int'l Corp. v. Rederi A/B Disa*, 151 F.2d 5, 8 (2d Cir. 1945).

**21.** *Cf. Empresa Central Mer. De R. v. Republic of U. S. of Brazil*, 257 F.2d 747, 749 (2d Cir. 1958) (having failed to attend joint survey, defendant cannot complain of its nature and scope); *The Rosalia*, 264 F. 285, 290 (2d Cir. 1920); *Konfort, S. A. v. The S.S. Santa Cerro*, 190 F.Supp. 1, 6 (S.D.N.Y.1960).

**22.** *Cf. Interstate Steel Corp. v. S.S. "Crystal Gem,"* 317 F.Supp. 112, 121 (S.D.N.Y.1970) (reconditioning costs may be awarded "where such costs were less than the diminution in market value sustained and did not exceed the value of the cargo prior to injury").  Although Toran calculated the cost of labor involved in

theless, the Court is convinced that plaintiff's delay in selling the boots for salvage did enhance the damage and an appropriate offset in the amount awarded is required. The damage figure of $7,094.48 will therefore be reduced by 10%, yielding an award of $6,385.03,[23] plus interest to be computed from October 11, 1974 at 6 per cent per annum.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

unpacking and repacking the cartons and the cost of replacing the master cartons and inner boxes, he did not offer an estimate of the cost of reconditioning, i. e., talcing, the boots.

23. In contrast to *Armco Int'l Corp. v. Rederi A/B Disa*, 151 F.2d 5, 9 (2d Cir. 1945), some effort was made here to show how much the delay in selling the cargo further impaired its value. Although Toran's estimate of the extent to which the damage was aggravated is overstated, some reduction in recovery is warranted. The final award may not be precise, but "it has long been recognized that courts of admiralty may apply equitable principles in attempting to reach a just result." *Hato La Vergarena, C. A. v. S.S. Susaa*, 1973 A.M.C. 195, 201 (S.D. N.Y.1972); see *The Georgian*, 76 F.2d 550, 551 (5th Cir. 1935).