CENTENNIAL INSURANCE CO., Plaintiff,

v.

M/V CONSTELLATION ENTERPRISE, its engines, boilers, etc., Constellation Lines S.A., d/b/a Constellation Line, and Entermar Shipping Co., S.A., Defendants.

No. 85 Civ. 6724 (EW).

United States District Court, S.D. New York.

July 17, 1986.

Donovan, Maloof, Walsh & Kennedy, New York City, for plaintiff; James W. Carbin, Daniel McDermott, of counsel.

Freehill, Hogan, & Mahar, New York City, for defendants; Peter J. Gutowski, of counsel.

EDWARD WEINFELD, District Judge.

Plaintiff Centennial Insurance Company ("Centennial") commenced this action against the M/V Constellation Enterprise, the vessel, Constellation Lines, S.A., the charterer, and Entermar Shipping Co. S.A., the owner of the vessel, for damage to cargo. Plaintiff was the insurer of 200 rolls of cotton grey cloth carried aboard the M/V Constellation Enterprise from Izmir, Turkey, to Charleston, South Carolina, under two clean bills of lading dated November 29, 1983 and December 6, 1983. Plaintiff, having paid the insured consignee, sues under its subrogation rights.

During ocean transit, the M/V Constellation Enterprise experienced weather conditions which caused seawater to wash over the weather deck of the ship, where the rolls of cotton were stowed in a container. After the ship arrived in Charleston, the cotton rolls were surveyed by representatives of the plaintiff and the defendants. Sixty-four rolls were found to be slightly wet and mildewed. After reconditioning these rolls were fit for their intended purpose. Thirty-six rolls were unusable and disposed of at salvage. Plaintiff seeks to recover $15,664.66 for the unusable rolls less their salvage value, the reconditioning expenses for the usable rolls, and the surveyor's fees.[1]

## DISCUSSION

A consignee or shipper seeking to recover from a carrier for damage to cargo bears the initial burden of proving that the cargo was delivered to the carrier in good condition and outturned in a damaged state.[2] They are not required to prove that

---

1. At the conclusion of the trial, plaintiff abandoned its claim that defendants had breached an alleged settlement agreement. *See* Trial Tr. at 88.

2. *See, e.g., M. Golodetz Export Corp. v. S/S Lake Anja,* 751 F.2d 1103, 1109 (2d Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 2361, 86 L.Ed.2d 261 (1985); *Westway Coffee Corp. v. M.V. Netuno,* 675 F.2d 30, 32 (2d Cir.1982); *Caemint Food,*

*Inc. v. Brasileiro,* 647 F.2d 347, 352 (2d Cir. 1981); *Vana Trading Co. v. S.S. Mette Skou,* 556 F.2d 100, 104 (2d Cir.), *cert. denied,* 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977); *Demsey & Assocs. v. S.S. Sea Star,* 461 F.2d 1009, 1015 (2d Cir.1972); *C. Itoh & Co. v. Hellenic Lines, Ltd.,* 470 F.Supp. 594, 596 (S.D.N.Y.1979); *Margarine Verkaufsunion G.m.B.H. v. M.T. G.C. Brovig,* 318 F.Supp. 977, 980 (S.D.N.Y.1970).

the carrier was at fault or how the damage might have occurred.[3]

To establish that the rolls of cotton were delivered to the carrier in good condition, plaintiff relies on the clean bills of lading issued in Izmir, Turkey. Generally a clean bill of lading is sufficient to meet this burden.[4] Defendants contend, however, that plaintiff has failed to prove the cotton rolls were delivered to the carrier in good condition because the words "shipper stow load and count" were stamped on the bills of lading. Relying on the hearsay testimony of the charterer's claims manager, defendants argue that the words "shipper stow load and count" indicate that the cargo was stuffed into the container at the pier by the shipper, not by the carrier, and that the carrier received the cargo in a sealed container. Therefore, defendants assert, plaintiff cannot rely solely on the clean bills of lading.

Plaintiff points to the fact that the bills of lading were stamped "pier/house" and "clean on board." Plaintiff argues that the accepted definition of "pier/house" is that the goods were loaded into the container on the pier by the carrier.[5]

It appears that the phrases "pier/house" and "shipper stow load and count" are in direct conflict, but neither side offered credible evidence or expert testimony as to the accepted industry definitions of these terms, either when they are used separately or in conjunction with each other. However, the Court need not resolve this conflict because defendants concede that, at a minimum, the clean bills of lading establish that the cargo container was loaded on board the vessel in an undamaged condition.[6] "A shipper or consignee who has not proved delivery in good condition may nevertheless establish a prima facie case for recovery by producing sufficient evidence that the nature of the damage suffered indicates that the damage occurred while the cargo was in the carrier's custody."[7]

The parties stipulated that the container was stored on the ship's weather deck and that seawater washed over the weather deck during the voyage to Charleston. Plaintiff introduced uncontroverted evidence that when the container, which itself was "clean on board" in Izmir, arrived in Charleston, it had a hole in the roof approximately 12" x 14"; there was an "improper patch" over a hole; and there were several other smaller holes in the container.[8] The unrebutted evidence also establishes that the cotton rolls were wet and that the damage was caused only by seawater. Common sense and logic compel the conclusion that the cotton rolls, which were stowed in a container with holes on the ship's weather deck while seawater washed over the deck and which were found to have been damaged solely by seawater, were damaged during shipment by the carrier. The Court finds that plaintiff has satisfied its burden of establishing a prima facie case.

Thus, the burden shifts to the carrier to show that it exercised due diligence to avoid and prevent the harm or that the cause of the damage falls within one of the exceptions set forth in section 1304(2) of

3. *M. Golodetz Export Corp.*, 751 F.2d at 1109; see also *Nissho-Iwai Co. v. M/T Stolt Lion*, 617 F.2d 907, 912 (2d Cir.1980).

4. *C. Itoh & Co. v. Hellenic Lines, Ltd.*, 470 F.Supp. 594, 596 (S.D.N.Y.1979) (citing cases); see also *Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347, 352 (2d Cir.1981); *Vana Trading Co. v. S.S. Mette Skou*, 556 F.2d 100, 103 n. 4 (2d Cir.), cert. denied, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977); *Woodhouse Drake & Carey (Trading), Inc. v. S.S. Hellenic Challenger*, 472 F.Supp. 31, 33 (S.D.N.Y.1979).

5. See *Austracan (U.S.A.), Inc. v. Neptune Orient Lines, Ltd.*, 612 F.Supp. 578, 584–86 (S.D.N.Y. 1985).

6. See Trial Tr. at 59; Defendants' Post-Trial Memorandum of Law at 4–5.

7. *Caemint Food, Inc.*, 647 F.2d at 355; see also *Tokio Marine & Fire Ins. Co. v. M/V L. Jalabert Bontang*, 624 F.Supp. 402, 408–09 (S.D.N.Y. 1985); *Gova Foods, Inc. v. S.S. Italica*, 561 F.Supp. 1077, 1082–83 (S.D.N.Y.), aff'd without opinion, 742 F.2d 1434 (2d Cir.1983).

8. See Trial Tr. at 28–29.

the Carriage of Goods by Sea Act (COG-SA).[9] Defendants failed to offer any evidence to show that one of the COGSA exceptions applies.[10]

Defendants instead assert in their post-trial papers that the complaint should be dismissed because the plaintiff, Centennial, is not the real party in interest as required by Fed.R.Civ.P. 17(a). Plaintiff is suing as the subrogee of the insured, Monica Textile Corporation ("Monica"), the importer of the cotton rolls. The evidence at trial established that Monica paid for the rolls but that the insurance claim was paid by Centennial to W. Gamby & Company ("W. Gamby"). The evidence then offered as an explanation for the payment to W. Gamby was ambiguous. Ashwin Sheth, the assistant traffic manager for Monica, testified that Monica is an affiliated associate of W. Gamby.[11]

Defendants raised the defense that plaintiff was not the real party in interest in their answer but failed to raise it in any pretrial motions or in the pretrial order. In the interests of justice, the Court, on its own motion, reopened the case for the limited purpose of allowing both sides to present additional evidence on this question. The evidence shows that Monica and W. Gamby are among a group of corporations that are operated as one unit. The Centennial marine open cargo insurance policy covering this claim was issued to W. Gamby and/or Monica and it provides that any losses are payable to W. Gamby and/or Monica.[12] Centennial issued three checks in satisfaction of the claim submitted by Monica for the damaged cargo, each check payable to W. Gamby and/or Monica. For recordkeeping purposes the checks were deposited in W. Gamby's bank account and then allocated to Monica Textile. Both W. Gamby and Monica approve and ratify the litigation by Centennial.

Defendants now contend that because two of the checks issued to W. Gamby and/or Monica are stamped "loan and trust agreement," Centennial is not the real party in interest.[13] Despite the fact that the Centennial drafts were introduced into evidence during the trial, defendants did not raise this issue in their post-trial brief and did not offer any evidence during the trial or the reopened proceedings of the existence or terms of any loan agreement between Centennial and the consignee. "In the usual agreement of this sort it is contemplated that the assured will bring suit in its own name against the party who has caused the loss and is legally responsible therefor and will reimburse the insurer out of the proceeds of the suit."[14] Defendants rely solely on the words printed on Centennial's drafts and make no attempt to show that Monica agreed to prosecute an action against the defendants, with any proceeds to be used to reimburse Centennial, as is the case in the usual loan agreement. In fact, the controller of Monica and W. Gamby testified that the drafts were issued by Centennial in payment of Monica's claim and that he understood the agreement with the insurance company was that the insur-

9. 46 U.S.C. § 1304(2) (1982). *See M. Golodetz Export Corp. v. S/S Lake Anja,* 751 F.2d 1103, 1110 (2d Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 2361, 86 L.Ed.2d 261 (1985); *Westway Coffee Corp. v. M.V. Netuno,* 675 F.2d 30, 32 (2d Cir.1982); *Vana Trading Co. v. S.S. Mette Skou,* 556 F.2d 100, 105 (2d Cir.), *cert. denied,* 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977); *Mobil Sales & Supply Corp. v. M.V. Banglar Kakoli,* 588 F.Supp. 1134, 1139 (S.D.N.Y.1984); *National Starch & Chemical Corp. v. SS Hermione,* 399 F.Supp. 1177, 1179 (S.D.N.Y.1975), *aff'd mem.,* 538 F.2d 310 (2d Cir.1976).

10. Defendants offered no evidence to support the argument raised in their pretrial brief that the severe weather encountered by the M/V

Constellation Enterprise constituted a peril of the sea under 46 U.S.C. § 1304(2)(c).

11. *See* Trial Tr. at 16–17.

12. Plaintiff's Exh. 25.

13. *See American Dredging Co. v. Federal Ins. Co.,* 309 F.Supp. 425 (S.D.N.Y.1970); *Lukenbach Steamship Co. v. Coast Mfg. & Supply Co.,* 185 F.Supp. 910 (E.D.N.Y.1960); *Hartford Fire Ins. Co. v. Commercial Union Assurance Co.,* 131 F.Supp. 751 (S.D.N.Y.1955); *see also Luckenbach v. McCahan Sugar Co.,* 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170 (1918).

14. *American Dredging Co.,* 309 F.Supp. at 427.

ance company, not Monica, would attempt to collect the money.[15]

Defendants also ignore the fact that Fed.R.Civ.P. 17(a) expressly provides: "No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by ... the real party in interest." During the trial, Sheth testified that Monica and W. Gamby approved of the litigation.[16] During the reopened proceeding, the controller made it clear that both W. Gamby and Monica ratify the litigation commenced by Centennial.[17] Accordingly, the Court finds that Centennial is the proper party to prosecute this action against the defendants.[18]

Defendant Entermar Shipping Co., S.A. ("Entermar") argues that the complaint should be dismissed as to it since plaintiff has not shown that it was a "carrier" as defined in COGSA. Section 1301(a) defines "carrier" to include "the owner or the charterer who enters into a contract of carriage with a shipper." Entermar contends that it is not a party to the bills of lading and that the bills of lading expressly identify defendant Constellation Lines S.A. ("Constellation"), the charterer of the vessel, as the "carrier."

The Court finds that plaintiff has failed to sustain its burden of proving that Entermar was a "carrier." The bills of lading were printed on forms prepared by Constellation. In paragraph 2 the bills of lading expressly state that "the carrier contracting heretounder is Constellation." While the bills of lading also indicate that Constellation's agent, Constellation Navigation, Inc., acted as agents "for the master" in issuing the bills, plaintiff failed to introduce the time charter entered into by Entermar and Constellation or any other evidence to support a finding that Constellation had the authority to bind the owners of the vessel. Accordingly, Entermar is not liable in personam for the damages sustained by plaintiff and is entitled to judgment dismissing the complaint against it.[19]

Upon consent of the parties, the complaint is dismissed as to the defendant M/V Constellation Enterprise for failure to perfect service of process on the vessel through an arrest.[20]

The usual measure of damages "is the difference between the fair market value of the goods at the port of destination in the condition they were in when shipped and their value as damaged." [21] Because plaintiff failed to offer proof of the value of the rolls of cotton, the Court must look to the invoice price plus that portion of the costs attributable to the damaged rolls.[22]

The joint survey found that 36 rolls, or 18,014 meters, of cotton were unusable.

---

15. *See* Transcript of June 26, 1986, at 10, 12.

16. *See* Trial Tr. at 17.

17. *See* Transcript of June 26, 1986, at 8.

18. *See Motta v. Resource Shipping & Enters. Co.,* 499 F.Supp. 1365, 1371 (S.D.N.Y.1980); *see also National Safe Corp. v. Texidor Security Equip., Inc.,* 101 F.R.D. 467, 469–72 (D.P.R.1984); *Honey v. George Hyman Construction Co.,* 63 F.R.D. 443, 447–48 (D.D.C.1974).

19. *See Demsey Assocs. v. S.S. Sea Star,* 461 F.2d 1009, 1014–15 (2d Cir.1972); *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.,* 594 F.Supp. 1490, 1497–98 (S.D.N.Y.1984), *aff'd in part and vacated in part on other grounds,* 782 F.2d 329 (2d Cir.1986); *Travelers Indemnity Co. v. SS Polarland,* 418 F.Supp. 985, 990 (S.D.N.Y.1976); *Tube Prods. of India v. S.S. Rio Grande,* 334 F.Supp. 1039, 1041–42 (S.D.N.Y.1971); *see also In re Intercontinental Properties Management,*

S.A., 604 F.2d 254, 258–59 (4th Cir.1979); *Yeramex Int'l v. S.S. Tendo,* 595 F.2d 943, 947–48 (4th Cir.1979).

20. *See* Supplemental Admiralty Rule C(3); *see also International Terminal Operating Co. v. Skibs A/S Hidlefjord,* 63 F.R.D. 85, 87–88 (S.D.N.Y.1973); *Tube Prods. of India v. S.S. Rio Grande,* 334 F.Supp. 1039, 1041 (S.D.N.Y.1971).

21. *C. Itoh & Co. v. Hellenic Lines, Ltd.,* 470 F.Supp. 594, 598 (S.D.N.Y.1979) (citing cases); *see also Sequros Banvenez, S.A. v. S/S Oliver Drescher,* 761 F.2d 855, 861 (2d Cir.1985); *Insurance Co. of N. America v. S/S Italica,* 567 F.Supp. 59, 62–63 (S.D.N.Y.1983).

22. *Id; see also Mobil Sales & Supply Corp. v. M.V. Banglar Kakoli,* 588 F.Supp. 1134, 1152 (S.D.N.Y.1984); *Woodhouse Drake & Carey (Trading), Inc. v. S.S. Hellenic Challenger,* 472 F.Supp. 31, 34–35 (S.D.N.Y.1979).

The invoice price was 90 cents per meter, giving a value of $16,212.60. When the cost of reconditioning the 64 partially damaged but usable rolls, the costs for handling and storage of the rolls by the Commercial Bonded Warehouse, the import duty costs, and the survey costs are added to this amount, and the value of the rolls sold at salvage is subtracted therefrom, the resulting damages to plaintiff total $15,514.66.[23] There is no evidence in the record that plaintiff failed to mitigate its damages. The Court, in its discretion, awards plaintiff prejudgment interest from January 4, 1983, the date the rolls of cotton arrived in Charleston.[24]

In summary, the complaint is dismissed as to defendants Entermar and M/V Constellation Enterprise. Defendant Constellation shall pay to plaintiff the sum of $15,514.66 plus interest.

The foregoing shall constitute the Court's findings of fact and conclusions of law. Judgment may be entered accordingly.

So ordered.

---

**23.** Reconditioning expenses = $1,922.46; Commercial Bonded Warehouse charge = $405.09; import duty = $1,272.65; survey costs = $711.86; salvage value = $5,010.00. Plaintiff also sought to recover $150.00 for the cost of insurance. The Court disallows this expense since it would have been incurred regardless of whether the rolls had been damaged.

**24.** *See Mitsui & Co., Ltd. v. American Export Lines,* 636 F.2d 807, 823–24 (2d Cir.1981).